**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　　　*Plaintiff-Appellee,*

v.

ISRAEL RAMOS-CRUZ, a/k/a Taylor,
a/k/a Tailor, a/k/a Sastre,

　　　　　　　*Defendant-Appellant.*

No. 08-4647

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, Chief District Judge.
(8:05-cr-00393-DKC-1)

Argued: October 28, 2011

Decided: January 18, 2012

Before NIEMEYER, DUNCAN, and FLOYD,
Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Niemeyer joined. Judge Floyd wrote a separate opinion concurring in part and concurring in the judgment.

**COUNSEL**

**ARGUED:** Sapna Mirchandani, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant. John Alexander Romano, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, Baltimore, Maryland, for Appellant. Lanny A. Breuer, Assistant Attorney General, Greg D. Andres, Acting Deputy Assistant Attorney General, James M. Trusty, Deputy Chief, Gang Unit, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, Chan Park, Robert K. Hur, Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

---

**OPINION**

DUNCAN, Circuit Judge:

A jury convicted appellant Israel Ramos-Cruz on nine criminal counts related to his membership in the gang La Mara Salvatrucha (also known as "MS-13"). Ramos-Cruz appeals his convictions under 18 U.S.C. § 1512(a)(1)(C) for aiding and abetting witness-tampering murder and under 18 U.S.C. § 922(g)(5)(A) for being an illegal alien in possession of a firearm. He also challenges the district court's decision to permit two witnesses to testify against him without revealing their names or other identifying information and the district court's denial of his motion to suppress evidence obtained during a search of his home. Although the district court based its § 1512(a)(1)(C) jury instructions on our decision in *United States v. Harris*, 498 F.3d 278 (4th Cir. 2007), which—while this appeal was pending—was abrogated by the Supreme Court's decision in *Fowler v. United States*, 131 S. Ct. 2045 (2011), we conclude that the error in instructing the

jury was harmless. Finding no other error, we affirm the district court's judgment.

## I.

## A.

Ramos-Cruz is a citizen of El Salvador who entered the United States illegally in 1999. In 2001, he was initiated into a subgroup or "clique" of the MS-13 gang[1] known as the Sailors Locotes Salvatruchos Westside (the "Sailors") that operates primarily in Prince George's County, Maryland, just outside of Washington, D.C. As part of his initiation, Ramos-Cruz took the nickname "Taylor." He eventually rose to a leadership position within the Sailors, acting as clique leader or "first word" from approximately 2003 to 2005. Although Ramos-Cruz's convictions were based upon wide-ranging criminal activity, we focus on the events relevant to the issues before us on appeal. We lay out additional facts as necessary in our analysis.

### 1.

On November 21, 2003, three members of the Sailors participated in the murder of Eluith Madrigal. Randy Calderon, a Sailor, brought Madrigal to the home of Juan Carlos Moreira, one of the founders of the Sailors clique, claiming that Madrigal was a member of a rival gang. Nelson Bernal, another founding member of the Sailors, was also present. Calderon and Madrigal began to fight, and the fight ended

---

[1]MS-13 is an international gang formed by El Salvadorian immigrants in Los Angeles in the 1980s. The gang has since expanded back into Central America, gaining prevalence in El Salvador, Honduras, Guatemala, and Mexico. MS-13 cliques now exist in cities throughout the United States, including the metro Washington, D.C. area, Los Angeles, Seattle, Phoenix, Houston, Boston, and New York. For additional information about the organization and operation of MS-13, see *United States v. Ayala*, 601 F.3d 256, 261 (4th Cir. 2010).

with Calderon and Bernal stabbing Madrigal to death. Moreira was angry that the murder had taken place in his home, and he ordered Calderon and Bernal to dispose of the body.

Following Madrigal's murder, Moreira drove Calderon, Bernal, and Moreira and Bernal's girlfriends to the residence of clique leader Ramos-Cruz. At trial, Bernal's girlfriend Sari Llenas testified that, during the car ride, Calderon seemed upset and mentioned calling the police.

Once the group arrived, Ramos-Cruz conferred with Moreira in private. Ramos-Cruz then announced that Moreira, Calderon, and another member of the Sailors nicknamed "Curly" were going to paint graffiti to commemorate the murder of Madrigal. Bernal testified to hearing Calderon say, "I know you think I'm not going to be tough enough, but nothing [sic] going to find out. I'm not going to tell nobody. I know you all want to kill me, but it's okay . . . . I'm going to be tough." J.A. 874-75. Ramos-Cruz did not respond, and Moreira told Calderon to shut up. Emilia Masaya, a member of the Sailors also present at Ramos-Cruz's home, testified to seeing Ramos-Cruz give Moreira a gun before Moreira left with Calderon.

Calderon did not return to Ramos-Cruz's residence that night; Moreira and Curly reappeared alone. Masaya testified to hearing Moreira tell Ramos-Cruz, "I got him." J.A. 1378. Members of the Prince George's County Police Department found Calderon's body the next morning—the morning of November 22, 2003—near a bridge next to a can of spray paint. Calderon had been shot in the head.

Ramos-Cruz convened a meeting of the Sailors several days later. During this gathering, he announced that Moreira had killed Calderon because Calderon had violated a gang rule and because he was considering talking to the police.

These events form the basis of Ramos-Cruz's conviction under § 1512(a)(1)(C).

2.

In January 2004, the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") began a collaboration with the Prince George's County Police Department known as the Regional Anti-Gang Enforcement ("RAGE") Task Force. The purpose of this collaboration was to address increased gang violence in the greater Washington metropolitan area. MS-13 was a primary focus of the task force.

On August 17, 2004, members of the RAGE task force executed a search warrant for Ramos-Cruz's residence. The warrant authorized officers to search the premises for evidence of malicious destruction of property. During their search, officers seized a loaded .380 caliber semiautomatic handgun. The DNA found on the gun matched Ramos-Cruz's DNA. Officers also seized other evidence, including several machetes; a fixed-blade knife; gloves marked with "MS-13," "Taylor," and "SLSW"; and a composition book containing MS-13 graffiti designs. The firearm found during this search, combined with Ramos-Cruz's immigration status, discussed further below, form the basis of his conviction under § 922(g)(5)(A).

B.

On June 4, 2007, a federal grand jury returned a fourth superseding indictment against Ramos-Cruz and fifteen others for crimes arising out of their involvement in MS-13. Ramos-Cruz was charged with conspiracy to participate in racketeering activity in violation of 18 U.S.C. § 1962(d), assault with a dangerous weapon in aid of racketeering in violation of 18 U.S.C. § 1959(a)(3), conspiracy to commit murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(5), murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1), witness-tampering murder in violation of 18 U.S.C.

§ 1512(a)(1)(C), two counts of use and carrying of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c), murder resulting from the use and carrying of a firearm during a crime of violence in violation of 18 U.S.C. § 924(j), and being an illegal alien in possession of a firearm in violation of 18 U.S.C. § 922(g)(5)(A).

1.

Prior to trial, Ramos-Cruz moved to suppress the evidence obtained during the August 17, 2004 search of his home. He argued that the affidavit on which the search warrant was based was insufficient to establish probable cause and that officers violated the knock-and-announce rule when they entered his residence. At a December 10, 2007, hearing before the district court, Ramos-Cruz withdrew his knock-and-announce argument, acknowledging that the Supreme Court's decision in *Hudson v. Michigan*, 547 U.S. 586 (2006), established that the exclusionary rule does not apply to knock-and-announce violations. The court then denied Ramos-Cruz's motion.

Also prior to trial, the government moved for permission for two El Salvadorian police officers to testify under pseudonyms and without revealing their dates and places of birth and home and work addresses. The government based its request on concern for the safety of the two officers and their families were it made public that they had testified against MS-13 members in a U.S. court. Ramos-Cruz objected, emphasizing his need to investigate the witnesses' backgrounds independently. The government submitted in camera affidavits from both prospective witnesses explaining the threat against them; it also disclosed to Ramos-Cruz in advance the substance of their proposed testimony. The district court noted that it had previously permitted these two witnesses to testify under the same precautionary measures in earlier trials involving the same MS-13 conspiracy. *See United States v. Zelaya*, 336 F. App'x 355, 357-58 (4th Cir.

2009) (unpublished) (affirming the district court's decision). It then conducted an ex parte hearing to determine whether the circumstances that had persuaded it to allow these witnesses to testify under pseudonyms in the past still existed. The court concluded that the potential threat to the officers' safety remained significant. The court also questioned the witnesses and determined that the government had no disclosure obligations under *Giglio v. United States*, 405 U.S. 150, 154-55 (1972). Accordingly, the district court granted the government's motion.

2.

Ramos-Cruz's trial began on February 5, 2008. He was tried with Santos Maximino Garcia, after the trials of the other defendants charged in the fourth superseding indictment were severed. Ramos-Cruz pleaded not guilty to all charges against him. A six-week trial ensued.

At trial, the government presented evidence regarding the facts discussed above relevant to Ramos-Cruz's convictions under § 1512(a)(1)(C) and § 922(g)(5)(A). It also presented additional evidence about Ramos-Cruz's immigration status, which is pertinent to Ramos-Cruz's § 922(g)(5)(A) conviction for being an illegal alien in possession of a firearm.

At issue with respect to § 922(g)(5)(A) was whether Ramos-Cruz had a pending application for temporary protected status ("TPS") pursuant to 8 U.S.C. § 1254a(b)(1) on August 17, 2004, when officers found him in possession of a firearm. Ramos-Cruz argued that if he had a pending application, he was not in the United States illegally.

TPS provides temporary benefits for citizens of foreign states in which circumstances exist that would prevent nationals of the state from returning in safety, such as an ongoing armed conflict or a natural disaster. El Salvador, Ramos-Cruz's native country, has been designated as such a state

since 2001. Aliens are prima facie eligible for TPS if they have been continuously present in the United States since the most recent designation of the relevant state—or a date designated by the attorney general—and if they have not, inter alia, been convicted of a felony or two or more misdemeanors committed in the United States. 8 U.S.C. § 1254a(c)(1)(A), (c)(2)(B). An applicant who establishes a prima facie case of eligibility for TPS is given two temporary benefits during the pendency of his application: protection from removal and authorization to seek employment. *Id.* at § 1254a(a)(4)(B). These benefits remain in place until a final determination has been made with respect to the alien's eligibility for TPS. *Id.* It is undisputed that after Ramos-Cruz entered the country illegally in 1999, he applied for TPS in 2001.

To address this issue, the government called former Immigration and Customs Enforcement ("ICE") officer James Colomb, who originally created Ramos-Cruz's alien file. Colomb testified that Ramos-Cruz initially appeared to have made a prima facie case of eligibility and, on June 22, 2001, was provided with employment authorization during the pendency of his TPS application.[2] His employment authorization was extended on January 16, 2003, and again on November 13, 2003.

Colomb testified, however, that ICE records further indicated that Ramos-Cruz's TPS application was denied on March 19, 2004. He also stated that ICE appears to have sent an intent-to-deny letter on March 31, 2004. Colomb explained:

> We have to send a notice of intent to deny out first
> . . . saying . . . we're going to deny unless this hap-
> pens. It's very possible they did the denial first inad-

---

[2]Colomb based his testimony on an ICE computer printout, introduced at trial as the government's exhibit "Record 8." J.A. 2106.

vertently and then went ahead and sent the notice of
intent to deny after the fact.

J.A. 2130. Upon further questioning, he confirmed that
Ramos-Cruz's TPS application "would have been denied."
J.A. 2131. Colomb did not specify why. Colomb also stated
that Ramos-Cruz had never been granted TPS.

Ramos-Cruz called his immigration attorney, Jaime
Aparisi, in an attempt to demonstrate that his application for
TPS was still pending in August 2004. After conducting voir
dire of Aparisi outside the presence of the jury, the district
court determined that he had no testimony to offer pertinent
to Ramos-Cruz's immigration status at the relevant time and
declined to allow him to testify. Ramos-Cruz called no other
witnesses and introduced no exhibits relevant to this question.

3.

At the close of evidence, Ramos-Cruz moved for a judg-
ment of acquittal on all counts. The district court denied the
motion, then proceeded to instruct the jury. In relevant part,
it explained that, the three elements the jury must find to con-
vict Ramos-Cruz of violating § 1512(a)(1)(C) were (1) that "a
person committed the premeditated murder of Randy Calde-
ron," (2) "that the person acted knowingly and with intent to
hinder, delay[,] or prevent the communication to a law
enforcement officer of the United States of information relat-
ing to the commission or possible commission of a federal
offense," and (3) "that the defendant aided and abetted that
person." J.A. 3877. It further explained that, for the jury to
find the second element,

> [t]he [g]overnment does not have to prove that the
> person specifically intended to interfere with a fed-
> eral investigation. All the statute requires is that the
> [g]overnment establish that at the time the person
> engaged in obstructionist conduct, he had the intent

> to influence an investigation that eventually hap-
> pened to be federal and that the investigation
> involved the possible commission of a federal crime.

J.A. 3879. Ramos-Cruz objected to this instruction, stating
that it did not correctly explain the federal nexus required for
conviction under § 1512(a)(1)(C). He also objected to the jury
instructions regarding § 922(g)(5)(A), which stated that a per-
son with a pending TPS application is in the United States
illegally. The district court overruled both of his objections.

The jury convicted Ramos-Cruz of all counts. The district
court sentenced him to life in prison, plus 35 years.

## II.

On appeal, Ramos-Cruz raises four arguments. First, he
contends that, in light of the Supreme Court's decision in
*Fowler*, the district court improperly instructed the jury
regarding the requirements for conviction under
§ 1512(a)(1)(C). Second, he contests the district court's denial
of his motion for judgment of acquittal on his conviction
under § 922(g)(5)(A). Third, he argues that the district court's
decision to allow the two El Salvadorian witnesses to testify
without revealing their names or other identifying information
violated his rights under the Confrontation Clause. Finally, he
contends that the district court improperly denied his motion
to suppress the evidence obtained during the August 17, 2004
search of his residence. We address these arguments in turn.

## A.

We first consider the effect of *Fowler* on our
§ 1512(a)(1)(C) jurisprudence. Section 1512(a)(1)(C) pun-
ishes the murder or attempted murder of another person "with
intent to . . . prevent the communication by any person to a
law enforcement officer . . . of the United States of informa-
tion relating to the commission or possible commission of a

[f]ederal offense." In *Harris*, we considered the issue of what the government must show to allow a jury to make a sufficient connection between the communication the defendant acted to prevent and federal law enforcement officers. We explained that "[s]o long as the information the defendant seeks to suppress actually relates to the commission or possible commission of a federal offense, the federal nexus requirement is established." *Harris*, 498 F.3d at 286. The district court followed this guidance when instructing the jury below.

Ramos-Cruz contends that, following the intervening Supreme Court decision in *Fowler*, our interpretation of § 1512(a)(1)(C) is no longer valid, and his conviction on this count must be reversed. We agree that *Fowler* rendered the jury instructions incorrect, but for the reasons discussed below, we find the instructional error harmless.

In *Fowler*, the Supreme Court considered the evidentiary showing necessary to sustain a conviction under § 1512(a)(1)(C) in circumstances—analogous to those here—in which a defendant killed his victim to prevent communication with law enforcement in general, rather than with federal law enforcement specifically. 131 S. Ct. at 2048. Charles Fowler shot and killed a local police officer when the officer discovered Fowler and several other men preparing to rob a bank. He was convicted of violating § 1512(a)(1)(C). On appeal, he argued that the government had not offered sufficient evidence to show that Fowler had killed the officer to prevent him from communicating with *federal* officers. The Eleventh Circuit affirmed Fowler's conviction, holding that "the *possible* or *potential* communication to federal authorities of a possible federal crime is sufficient for the purposes of section 1512(a)(1)(C)." *United States v. Fowler*, 603 F.3d 883, 888 (11th Cir. 2010), *overruled by Fowler v. United States*, 131 S. Ct. 2045 (2011).

The Supreme Court rejected the Eleventh Circuit's "possible or potential communication" test. *Fowler*, 131 S. Ct. at

2051-52. The Court first confirmed that § 1512(a)(1)(C) does apply to "a defendant who kills with intent to prevent communication with law enforcement officers generally," but only if the government in such a case makes a showing about "the likelihood of a hypothetical communication with a federal law enforcement officer." *Id.* at 2050. The showing must demonstrate more than a mere possibility that the victim would have communicated with federal law enforcement officers, principally because much conduct punishable under state law also violates federal law, and "where a federal crime is at issue, communication with federal law enforcement officers is almost always a *possibility*." *Id.* at 2051. Thus, the Supreme Court reasoned, the Eleventh Circuit's formulation would "weaken or eliminate the independent force of" the language "of the United States" included in the statute and impermissibly broaden it to cover much criminal conduct that is "purely state in nature." *Id.* at 2051-52 (emphasis omitted).

The Supreme Court went on to hold that the appropriate standard for determining whether the government has demonstrated the appropriate federal nexus is whether it has shown "a *reasonable likelihood* that had, *e.g.*, the victim communicated with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer." *Id.* at 2052. In making this showing, "[t]he [g]overnment need not show that such a communication, had it occurred, would have been federal beyond a reasonable doubt, nor that it is even more likely than not." *Id.* It is required to show, however, "that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." *Id.* The Supreme Court remanded to the Eleventh Circuit to apply its newly articulated test. *Id.* at 2053.

Because the test we articulated in *Harris* is analogous to that overturned in *Fowler*, we recognize that *Harris* is no longer controlling. Further, because the district court here relied on *Harris* in instructing the jury, its § 1512(a)(1)(C) instruc-

tions were erroneous as to the federal nexus element of the offense.[3] A misinstruction regarding an element is nonetheless subject to harmless-error review. *See Neder v. United States*, 527 U.S. 1, 9-10 (1999); *United States v. Brown*, 202 F.3d 691, 699 (4th Cir. 2000).

We find an error in instructing the jury harmless if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder*, 527 U.S. at 18. In *Brown*, we considered whether the omission[4] of a jury instruction was harmless error in a situation analogous to that here: the district court declined to give an instruction not required under precedent that the Supreme Court later superseded. *Brown*, 202 F.3d at 698-99. To determine whether such an error was harmless under such circumstances, we mandated two inquiries. "First, where 'a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, . . . then the erroneous instruction is properly found to be harmless.'" *Id.* at 700 (quoting *Neder*, 527 U.S. at 17). Second, if the defendant contested the omitted element, we ask "whether 'the record contains evidence that could rationally lead to a contrary finding with respect to that omitted element.'" *Id.* at 701 (quoting *Neder*, 527 U.S. at 19). If not, then the error was harmless. *Id.* If so, however, reversal is necessary. *Id.* at 703.

---

[3] We review the denial of a request for a particular jury instruction for abuse of discretion. *United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010). Here, Ramos-Cruz objected to the district court's instructions on the ground that they did not properly explain the federal nexus required for conviction. *Fowler* rendered the district court's instructions incorrect with regard to that element of the offense, so the denial of Ramos-Cruz's request constituted an abuse of discretion.

[4] Although the error in *Brown* involved an omitted jury instruction and the error here is an erroneous instruction, we apply the same analysis. *See* 202 F.3d at 699 ("Although the error in *Neder* was based on a misinstruction, and the . . . error here is based on the omission of a required instruction, both errors effectively withdrew an element of the offense from the jury's consideration." (footnote omitted)).

Here, we must first determine if the question of whether Calderon was planning to communicate with federal law enforcement officers was contested at trial. If so, to determine whether the misinstruction was harmless error, we must review the record with an eye to whether, based on the evidence presented, a jury rationally could have found that there was *no* reasonable likelihood that had Calderon "communicated with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer." *Fowler*, 131 S. Ct. at 2052.

The government contends that the jury heard sufficient evidence at trial to render the erroneous instruction harmless.[5] It first points to the fact that federal charges were filed in this case related to the murder of Madrigal. It cites to testimony about the formation of the RAGE task force—involving both local and federal law enforcement—approximately one month after Calderon's murder. The jury also heard testimony that RAGE was focusing on the activities of MS-13 and specifically "looking at homicides and assaults that were committed by the gang members." J.A. 3583. Finally, the government

---

[5]The government also contends that Ramos-Cruz waived his objection to the jury instructions by not specifically raising the argument in his opening brief, citing our prudential doctrine requiring that a claim be raised at that point. *See, e.g.*, *Yousefi v. INS*, 260 F.3d 318, 326 (4th Cir. 2001) (finding that appellant waived an argument not raised in his opening brief). We decline to apply that doctrine here for two reasons. First, Ramos-Cruz preserved his objection to the § 1512(a)(1)(C) conviction by including it in his opening brief—albeit framed as a sufficiency of the evidence challenge—even though, at the time, *Harris* controlled in this circuit. Second and more importantly, we ordered supplemental briefing in this case following the Supreme Court's decision in *Fowler*, and in his supplemental brief, Ramos-Cruz outlined his objection to the jury instructions. Inclusion of this argument during supplemental briefing—which was initiated by this court and at which point we often accept additional arguments—fulfilled the important goal of putting the government on notice as to the substance of Ramos-Cruz's argument. As such, Ramos-Cruz's failure to explicitly challenge the jury instructions in his opening brief does not preclude him from doing so now.

notes that Detective Paula Hamill, the local police officer who investigated Madrigal's murder, testified to exchanging information about her investigation with ATF and the U.S. Attorney's office. There is other record evidence that supports the government's position, as well. Specifically, former MS-13 member Noe Cruz reported that he had begun cooperating with authorities in December 2003 and testified to speaking with federal prosecutors while serving as an informant between 2003 and 2005.

At trial, Ramos-Cruz did not contest—either on direct or cross-examination—the government's evidence about the formation of the RAGE task force, the focus of the RAGE task force, or Detective Hamill's cooperation with federal authorities during the investigation of Madrigal's murder. Ramos-Cruz called into question the credibility of Cruz on cross-examination; he never, however, specifically challenged his statements about cooperating with federal officers. In light of this uncontested evidence, we conclude that no rational juror could have found that there was *not* a reasonable likelihood that, had Calderon communicated with authorities, at least one relevant communication would have been to a federal law enforcement officer.

We base this conclusion on the guidance in *Fowler*, which emphasized that the government does *not* need to show "*beyond a reasonable doubt* (or even that it is *more likely than not*) that the hypothetical communication would have been to a federal officer." 131 S. Ct. at 2050. The government does, however, need to show more than "a mere possibility that a communication would have been with federal officials," *id.* at 2051, and that "the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical," *id.* at 2052. The government here presented enough evidence that a rational jury would necessarily conclude it was sufficiently likely that, had Calderon communicated with police, at least one relevant communication would have been made to federal law enforcement officers. In drawing this

conclusion, we do not focus solely upon the fact that Madrigal's murder was eventually prosecuted as a federal crime. Instead, we follow the Third Circuit in holding that the federal nexus element of § 1512(a)(1)(C) "may be inferred by the jury from the fact that the offense was federal in nature, plus additional appropriate evidence." *United States v. Bell*, 113 F.3d 1345, 1349 (3d Cir. 1997) (quoting *United States v. Stansfield*, 101 F.3d 909, 918 (3d Cir. 1996)); *accord United States v. Rodriguez-Marrero*, 390 F.3d 1, 13 (1st Cir. 2001) (adopting the *Bell* standard); *United States v. Diaz*, 176 F.3d 52, 91 (2d Cir. 1999) (same); *United States v. Causey*, 185 F.3d 407, 422 (5th Cir. 1999) (same); *United States v. Emery*, 186 F.3d 921, 925 (8th Cir. 1999) (same). We consider vital the additional evidence of the formation of the RAGE task force shortly after Madrigal's murder, RAGE's focus on investigating MS-13, Detective Hamill's communication with federal authorities regarding Madrigal's murder, the testimony of MS-13 informants explaining that they had spoken with federal law enforcement officers, and Ramos-Cruz's failure to contest any of this evidence. In light of this uncontroverted and overwhelming proof, we do not believe that "the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." *See Neder*, 527 U.S. at 19. We therefore find that the error in instructing the jury was harmless.

Ramos-Cruz raises two additional arguments, asserting that the fact that Madrigal's murder was eventually prosecuted as a state crime and that the RAGE task force did not exist at the time of the murders both undermine a finding that the reasonable likelihood standard was met. Ramos-Cruz did not bring forth these arguments at trial and relies instead upon the government's examination of its own witnesses as support for his position.

*Fowler* supports our rejection of these arguments. First, the Supreme Court recognized that "when a defendant acts in ways that violate state criminal law, some or all of those acts

will violate federal criminal law as well." *Fowler*, 131 S. Ct. at 2051. It made this observation as a point against allowing the mere fact that a crime could be federal to supply the federal nexus required by § 1512(a)(1)(C). *See id.* In doing so, however, it certainly did not suggest that, when other evidence demonstrated a reasonable likelihood of communication with a federal officer, the fact that the underlying crime could have been prosecuted under both state and federal law precluded prosecution under § 1512(a)(1)(C). *See id.*; *accord Rodriguez-Marrero*, 390 F.3d at 13 (finding that a murder that could have been prosecuted under state law but was included as part of a federal indictment constituted a federal offense for the purposes of § 1512(a)(1)(C)).

Second, *Fowler* specifically noted that prosecution under § 1512(a)(1)(C) reaches killings that occur before the victim has had any communication with law enforcement officers. 131 S. Ct. at 2049. This statement undermines Ramos-Cruz's argument that the federal investigation must be in effect at the time of the murder. As such, we join our sister circuits in recognizing that the government need not prove that a federal investigation was in progress at the time the defendant committed witness-tampering murder. *See, e.g.*, *United States v. Romero*, 54 F.3d 56, 62 (2d Cir. 1995) (holding that, to sustain a conviction under § 1512(a)(1)(C), "[t]here need not be an ongoing investigation or even any intent to investigate").[6] Moreover, to require that federal and state officials had been cooperating at the time of the murder would undermine the deterrent purpose of the statute. *See Fowler*, 131 S. Ct. at 2049-50. When, as occurred here, federal law enforcement authorities become involved in an investigation approximately

---

[6]We recognize that proof of an ongoing federal investigation can provide the additional evidence required to sustain a conviction under § 1512(a)(1)(C). *See, e.g.*, *Rodriguez-Marrero*, 390 F.3d at 13 (upholding defendant's conviction under § 1512(a)(1)(C) because, inter alia, federal authorities had launched an investigation prior to the victim's murder). We merely hold that evidence of an ongoing federal investigation is not *required* where, as is the case here, other appropriate evidence exists.

a month after the relevant murder, federal authorities are spe-
cifically focusing on the group in question, and local authori-
ties investigating the underlying crime are actively
cooperating with federal law enforcement officers, the reason-
able likelihood standard is met.

### B.

Ramos-Cruz next challenges his conviction under
§ 922(g)(5)(A) for being an illegal alien in possession of a
firearm. Ramos-Cruz contends that because his TPS applica-
tion was pending at the time he was found in possession of a
firearm and, as such, he was not illegally in the country, the
district court improperly denied his motion for acquittal.[7]
Because we believe that the government presented more than
sufficient evidence to allow the jury to conclude that Ramos-
Cruz's application for TPS had been denied at the relevant
time, we affirm.

We review a district court's denial of a motion for acquittal
de novo. *United States v. Campbell*, 977 F.2d 854, 856 (4th
Cir. 1992). In doing so, we "must decide whether, viewing the
evidence in the light most favorable to the government, *any*
rational trier of facts could have found the defendant guilty
beyond a reasonable doubt." *Id.* (internal quotation marks
omitted).

Section 922(g)(5)(A) prohibits possession of firearms by
aliens who are "illegally or unlawfully in the United States."
The statute does not define these terms. The district court
instructed the jury that a person would be "illegally or unlaw-

---

[7]Ramos-Cruz's brief is not entirely clear regarding whether he is
appealing the denial of his motion for judgment of acquittal or the jury
instructions. Because he concludes the section of his brief discussing this
point by referencing the motion for judgment of acquittal and because the
government understood his argument to refer only to the motion for judg-
ment of acquittal—and therefore only had notice about this argument—we
address the district court's holding regarding that motion.

fully" in the country for purposes of the statute even if he had a pending TPS application at the relevant time. Ramos-Cruz challenges this interpretation. He contends, as he did at trial, that the district court should have instructed the jury that a person with a pending TPS application is lawfully in the United States. Neither party disputes, however, that a person who entered the country illegally and had been *denied* TPS status would be an illegal alien. For the reasons discussed below, we believe the evidence presented at trial would have easily allowed a rational jury to determine that Ramos-Cruz's application for TPS had been denied on August 17, 2004—when he was found in possession of a firearm. We therefore decline to reach the statutory interpretation issue Ramos-Cruz urges upon us.

We base our conclusion on the evidence presented at trial. Specifically, the government's witness James Colomb testified several different times that Ramos-Cruz's application for TPS had been denied on March 19, 2004. Although Ramos-Cruz attempted through cross-examination and the unsuccessful attempt to call Aparisi as a witness to establish that Ramos-Cruz's application was still pending at the relevant time, the jury never heard any testimony to that effect. In fact, the final exchange between Ramos-Cruz's attorney and Colomb on cross-examination seems to have definitively established that Ramos-Cruz's application was no longer pending:

> Q.   Okay. So you are stating here today that there is not, in [Ramos-Cruz's] A file, an application for temporary status that would have postdated March 31, 2004. You're certain of that.
>
> A.   To my knowledge, no.

J.A. 2133. In sum, the government presented ample evidence to allow a rational jury to conclude that Ramos-Cruz did not have a pending TPS application at the relevant time.

On appeal, Ramos-Cruz argues that ICE had not come to a final decision regarding his TPS application at the relevant time, which he asserts is demonstrated by the fact that Ramos-Cruz allegedly had a valid employment authorization card in August 2004. In support of this argument, he makes claims that were not brought forth at trial and cites to documents from his alien file that he did not introduce or refer to at trial. To the extent Ramos-Cruz attempts to introduce new evidence before us, we will not consider it for the first time on appeal. Even if we did, the evidence to which he refers does not contradict the evidence the government presented demonstrating that Ramos-Cruz's application was denied in March 2004. At most, it shows that Ramos-Cruz was issued an extension to his employment authorization in November 2003 that was not set to expire until March 2005. The extension was issued before the denial of his TPS application in March 2004, and even assuming the employment authorization was technically still valid in August 2004—which Ramos-Cruz presented no evidence of—we are not persuaded that an expiration date for a separate document set months prior to the denial of Ramos-Cruz's TPS application in any way indicates that the denial was not final.

## C.

Ramos-Cruz also challenges the district court's decision to allow two government witnesses to testify under pseudonyms and without revealing their names, home and work addresses, or dates and places of birth. He contends that this ruling violated his Sixth Amendment right to confrontation, arguing that without the withheld information, he was not able to conduct independent research about the witnesses' veracity. "We review for abuse of discretion a trial court's limitations on a defendant's cross-examination of a prosecution witness." *United States v. Smith*, 451 F.3d 209, 220 (4th Cir. 2006).

In general, the Confrontation Clause guarantees a defendant the right to question an adverse witness about identifying

information, including his full name and address. *Smith v. Illinois*, 390 U.S. 129, 131 (1968) ("[T]he very starting point in exposing falsehood and bringing out the truth through cross-examination must necessarily be to ask the witness who he is and where he lives." (footnote omitted)). We have recognized that this right is not absolute, however, and that "a trial court may limit cross-examination if the information sought could endanger the witness." *Chavis v. North Carolina*, 637 F.2d 213, 226 (4th Cir. 1980). When the government seeks to withhold a witness's true name, address, or place of employment, it bears the burden of demonstrating that "the threat to the witness [is] actual and not a result of conjecture." *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969). If the government makes a showing of an actual threat, the district court still has discretion to review relevant information and determine whether disclosure of the witness's identifying information is necessary to allow effective cross-examination. *Id.*

As the district court noted, we previously approved of its decision to allow the identical El Salvadorian witnesses who testified here to testify under the same circumstances in another trial involving the same MS-13 conspiracy. *Zelaya*, 336 Fed. Appx. at 358. Although the decision in *Zelaya* is not binding, given that it involved the same witnesses and the same underlying conspiracy, we find it persuasive.

Here, the government explained to Ramos-Cruz and the district court its concerns regarding the danger to El Salvadorian citizens who testify against MS-13 members in U.S. courts. It also disclosed the substance of the testimony the two witnesses in question would provide at trial. Notably, that testimony did not involve Ramos-Cruz or his activities. Rather, it provided generalized information about the operation of MS-13. The government further submitted in camera affidavits from both witnesses explaining the specific threat to them were their identities revealed. Because these affidavits were originally sworn in 2006 and 2007, the district court conducted an ex parte hearing and examined the two El Salvado-

rian officers to determine whether disclosure of their names, addresses, or dates and places of birth to the defendant would continue to pose a danger to the officers and their families. It concluded that the same threat existed that had persuaded it to permit the officers to testify under these circumstances in *Zelaya*.

After a review of the sealed affidavits and the sealed transcript of the ex parte hearing, we cannot say that this decision was an abuse of discretion. As in *Zelaya*, "[t]he information provided to the district court indicated that the threat to these witnesses and their families, should their true identities be provided, was 'actual and not a result of conjecture.'" *Id.* (quoting *Palermo*, 410 F.2d at 472). Moreover, as we also noted in *Zelaya*, because "the government disclosed to the defense details of these two witnesses" before the trial, the defendants were able to "effectively cross-examine the witnesses without threatening their safety." *Id.*

Ramos-Cruz contends that the threats against the two witnesses were too speculative to warrant the protective action taken by the district court. He points to the fact that Ramos-Cruz is not himself accused of threatening the witnesses and argues that "[i]t is not sufficient to assert that *anyone* who testifies against one of its members faces danger from MS-13." Appellant's Br. 45. With regard to his first point, we agree with the D.C. Circuit that "[t]he appropriateness of using pseudonyms to protect witnesses does not depend on whether the threat to the witness comes directly from a defendant or from another source." *United States v. Celis*, 608 F.3d 818, 832 (D.C. Cir. 2010), *cert. denied* 131 S. Ct. 620 (2010). As to the second, we do not dispute that such a generalized statement would be insufficient to show that a threat against a witness was "actual and not a result of conjecture." *Palermo*, 410 F.2d at 472. The witnesses here, however, specifically explained the heightened level of danger to which El Salvadorians who testify against MS-13 in U.S. courts are subject. They then connected that threat to the specific investigative

work they perform in El Salvador. We believe that this level of specificity is sufficient.

Finally, we reiterate the limited focus of the witnesses' testimony. They proffered no evidence directly involving Ramos-Cruz or his activities. They merely provided background information about the internal workings of MS-13 generally. On these facts, we cannot conclude that the district court abused its discretion.

## D.

Ramos-Cruz's final contention is that the district court erred by denying his pretrial motion to suppress the evidence obtained during the August 17, 2004 search of his residence. He contends that the search warrant was not supported by probable cause and that officers violated the knock-and-announce rule. We examine each of these claims in turn. When evaluating a district court's denial of a motion to suppress, "we review the district court's factual findings for clear error and its legal determinations de novo." *United States v. Perry*, 560 F.3d 246, 251 (4th Cir. 2009).

## 1.

A Maryland state court judge issued a search warrant for Ramos-Cruz's residence based on an affidavit submitted by Detective Murphy, a gang unit detective with the RAGE task force. Ramos-Cruz contends that this affidavit contained little more than bare assertions and did not provide the issuing judge with a proper basis to determine that evidence of a crime would be found at the location named. We disagree.

"A police officer seeking the issuance of a search warrant must present an affidavit containing facts sufficient to provide the [judge] with a substantial basis for determining the existence of probable cause." *Doe v. Broderick*, 225 F.3d 440, 451 (4th Cir. 2000) (internal quotation marks omitted). Probable

cause exists when "there are reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe that the items sought constitute fruits, instrumentalities, or evidence of crime and will be present at the time and place of the search." *United States v. Suarez*, 906 F.2d 977, 984 (4th Cir. 1990). We afford a judge's finding of probable cause "great deference on review." *Id.*

The affidavit Murphy presented here supported the judge's finding of probable cause. Murphy sought to search Ramos-Cruz's home for evidence of malicious destruction of property. In support, he described a photograph of an individual painting graffiti depicting an MS-13 hand symbol and the name "Taylor"; he also included a copy of the photograph. He stated that the person in the photograph was "known to" Sergeant Norris, a fellow member of the RAGE task force, as Ramos-Cruz, alias "Taylor." S.J.A. 5. He explained that the RAGE task force knew Ramos-Cruz to be a member of the Sailors. Murphy further stated that, based on his six years of police experience, persons who create graffiti typically keep materials at their residences. Finally, Murphy specifically stated that Ramos-Cruz resided at the address Murphy sought to search and that Norris had seen Ramos-Cruz entering and exiting the residence while conducting surveillance of this location.

Ramos-Cruz argues that the affidavit stated no basis for the conclusion that the person in the photograph was Ramos-Cruz, that his alias was "Taylor," or that he was a member of MS-13. Appellant's Br. 24. On the contrary, the affidavit clearly states the basis for these assertions: Murphy's colleague Norris's experience as a member of the RAGE task force. Because "[o]bservations of fellow officers . . . engaged in a common investigation are plainly a reliable basis for a warrant," *United States v. Ventresca*, 380 U.S. 102, 111 (1965), Norris's observation was sufficient. Ramos-Cruz also contends that there was no basis for determining evidence of

property destruction would be found at his residence. Murphy made this assertion based upon his six years of experience dealing with gangs and graffiti, and common sense supports it. Especially given our deferential standard of review, we do not see any ground for finding that the affidavit did not support a finding of probable cause.[8]

### 2.

Lastly, Ramos-Cruz alleges that police officers failed to knock and announce their presence before entering his residence, and he contends that this alleged oversight warrants application of the exclusionary rule. Although he chose to raise it in his brief before us, Ramos-Cruz himself acknowledged the futility of this argument when he withdrew it before the district court. Without deciding whether the officers violated the rule, we reiterate that in *Hudson v. Michigan*, the Supreme Court held that the exclusionary rule does not apply to knock-and-announce violations. 547 U.S. at 599. Because there is clear, binding precedent barring the remedy Ramos-Cruz seeks, his argument has no merit.

### III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

FLOYD, Circuit Judge, concurring in part and concurring in the judgment:

One of the issues we address today is whether, consistent

---

[8] The government argues that, even if the warrant was not supported by probable cause, the officers who searched Ramos-Cruz's home relied upon it in good faith. Because the affidavit supported a finding of probable cause, we need not reach this argument.

with the Sixth Amendment, the government may convict a criminal defendant through the use of anonymous witnesses—that is, witnesses who testify using pseudonyms and whose true names remain unknown to the defense. I think not. Thus, I write separately because, in my opinion, the district court erred when it allowed two of the government's witnesses to testify using pseudonyms without requiring that the government disclose their true names to the defense. But, because the error was harmless, I would nevertheless affirm the judgment of the district court.

I.

A.

The right to cross-examination, which the Sixth Amendment guarantees,[1] is essential to ensuring that criminal defendants receive a fair trial. *See Pointer v. Texas*, 380 U.S. 400, 404-05 (1965). The Supreme Court has long recognized that "[t]here are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Id.* at 405.

Cross-examination is, practically speaking, one of the most valuable tools a criminal defendant has to contest the government's case, for it is the primary means through which he may challenge a witness's testimony against him. *See Davis v. Alaska*, 415 U.S. 308, 316 (1974). Through effective cross-examination, the criminal defendant may ferret out falsehoods and expose inconsistencies in a witness's testimony, *see*

---

[1]Although the Sixth Amendment does not explicitly mention the right to cross-examination, the Supreme Court has recognized that the right of confrontation includes the ancillary right of cross-examination. *See Davis v. Alaska*, 415 U.S. 308, 315 (1974).

*Pointer*, 380 U.S. at 404, as well as challenge the witness's perceptions and memory, *Davis*, 415 U.S. at 316. Cross-examination further provides the defendant with the opportunity to impeach the witness's credibility by demonstrating bias, prejudice, or ulterior motive, or by revealing facts about the witness that suggest an untruthful disposition. *See id.* In short, the right to confront and cross-examine witnesses "ensure[s] the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990).

Yet the importance of cross-examination in a criminal trial extends beyond the practical benefits it confers upon the defendant. The availability of meaningful cross-examination also fosters society's perception that criminal trials are open and fair. *Lee v. Illinois*, 476 U.S. 530, 540 (1986). It does so by "ensuring that convictions will not be based on the charges of unseen and unknown—and hence unchallengeable—individuals." *Id.* If safeguarded, it reflects that, in a court of law, criminal trials are even contests between the government and the accused. *See id.*

Criminal defendants do not have free rein on cross-examination, however. The Sixth Amendment "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Trial judges thus possess "wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *see also Chavis v. North Carolina*, 637 F.2d 213, 226 (4th Cir. 1980) (recognizing the trial court's discretion to limit cross-examination for many of the same reasons). Because we entrust trial judges with such discretion, we review a trial

court's limitations on a criminal defendant's cross-examination for an abuse of discretion. *United States v. Smith*, 451 F.3d 209, 220 (4th Cir. 2006).

## B.

The Supreme Court, in *Smith v. Illinois*, 390 U.S. 129 (1968), confronted the issue of whether a trial court may prohibit a criminal defendant from inquiring on cross-examination as to the true name of the witness testifying against him. The defendant was charged with, and ultimately convicted of, illegally selling narcotics. *Id.* at 129. The primary witness against him was a man who identified himself as "James Jordan." *Id.* at 130. The witness claimed to have purchased narcotics from the defendant, and the case hinged in large part on whose story the jury believed: the witness's or the defendant's. *Id.* On cross-examination, the witness admitted that James Jordan was not his real name. *Id.* The defense attorney then asked the witness what his true name was, but before the witness could answer, the government objected. *Id.* The trial court sustained the objection, forbidding the defense attorney from inquiring as to the witness's true name. *Id.* On appeal, the Appellate Court of Illinois affirmed the defendant's conviction. *Id.* at 129.

The Supreme Court held that the trial court's prevention of the defense attorney from inquiring into the witness's true name violated the defendant's Sixth Amendment right to cross-examination. *Id.* at 133. Although the Court recognized that the case did not involve the "complete denial of all right of cross-examination," it observed that "when the credibility of a witness is in issue, the very starting point in 'exposing falsehood and bringing out the truth' through cross-examination must necessarily be to ask the witness who he is and where he lives." *Id.* at 131 (footnote omitted) (quoting *Pointer*, 380 U.S. at 404). It then noted that "[t]he witness'[s] name and address open countless avenues of in-court examination and out-of-court investigation." *Id.* It concluded that

"[t]o forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself." *Id.*

Justice White authored a concurrence, which Justice Marshall joined, advocating that the personal safety of witnesses was a proper reason to limit cross-examination. *Id.* at 133-34 (White, J., concurring). He maintained that, before barring a question that is normally appropriate, courts should require either the government or the witness to demonstrate why the witness should not have to answer it. *Id.* at 134. According to Justice White, the trial court could "then ascertain the interest of the defendant in the answer and exercise an informed discretion in making his ruling." *Id.* Ultimately, he concluded that, in the case presented, neither the State nor the witness had made any showing to justify allowing the witness to refuse to provide his name. *Id.*

Many courts have since seized upon Justice White's concerns and held that *Smith* does not compel a rigid rule of disclosure of a witness's true name and address when it would pose a threat to the witness's safety. *See, e.g.*, *United States v. El-Mezain*, No. 09-10560, 2011 WL 6058592, at *9 (5th Cir. Dec. 7, 2011); *Siegfriedt v. Fair*, 982 F.2d 14, 17 (1st Cir. 1992); *United States v. Rangel*, 534 F.2d 147, 148 (9th Cir. 1976); *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969); *People v. Stanard*, 365 N.E.2d 857, 863 (N.Y. 1977). But at least one of these courts has indicated trepidation when it is the witness's true name that the government seeks to withhold. *See Palermo*, 410 F.2d at 472 ("Under almost all circumstances, the true name of the witness must be disclosed."). Furthermore, not all courts have allowed the government to completely withhold the true names of witnesses from the defense, even when the safety of the witnesses was in danger. *See, e.g.*, *United States v. Celis*, 608 F.3d 818, 829-30 (D.C. Cir. 2010) (describing a district court's protective order that allowed witnesses to testify using pseudonyms but required disclosure of their true names to defense counsel);

*Alvarado v. Superior Court*, 5 P.3d 203, 223 (Cal. 2000) ("[W]hen nondisclosure of the identity of a crucial witness will preclude effective investigation and cross-examination of that witness, the [C]onfrontation [C]lause does not permit the prosecution to rely upon the testimony of that witness at trial while refusing to disclose his or her identity.").

These latter courts often utilize or advocate protective orders as a means of balancing the criminal defendant's right to cross-examine a witness with the need to protect the witness's safety. *See Celis*, 608 F.3d at 829-30 (approving the district court's use of a protective order); *Alvarado*, 5 P.3d at 206 ("[W]e emphasize that the trial court remains free to fashion a more limited order denying, restricting, or deferring disclosure of the identity of each witness *before* trial (including limiting disclosure to defendants' counsel), as long as that order does not impermissibly impair defendants' right to confront and cross-examine the witnesses effectively *at trial*."). For example, in *Celis*, the district court entered a protective order that allowed witnesses to testify using pseudonyms, but required the government to release their true names to defense counsel. *Celis*, 608 F.3d at 829. The order further provided that defense counsel could, in turn, share the names with the represented defendants and one other member of the defense team, but it prohibited sharing the names with anyone else without leave of the court. *Id.* During the trial, the district court allowed defense counsel to perform limited investigations of some of the witnesses in Colombia and postponed cross-examination in at least one instance to allow for an authorized investigation. *Id.* at 830. The D.C. Circuit approved this practice, determining that it appropriately balanced the defendants' right to cross-examination with the need to protect the safety of the witnesses. *See id.* at 833-34.

II.

A.

I do not take lightly the safety concerns accompanying the decisions made by Juan Diaz and Jose Perez—the two witnesses who testified using pseudonyms[2]—to testify against Ramos-Cruz. As the record reflects, MS-13 has demonstrated its willingness to engage in violent reprisal against witnesses who testify against its members. There is no denying that by agreeing to testify against Ramos-Cruz, Diaz and Perez exposed themselves to danger. Most assuredly, requiring them to state their true names in open court would have made it easier for MS-13 to target them and their families. Safety concerns were thus real and valid.

We must recognize, however, that these concerns inhere in many prosecutions of defendants who are members of violent criminal organizations. The sad truth is that, in this respect, the situation presented in today's case is not rare. Gangs often employ violence as a means of intimidating witnesses. Laura Perry, Note, *What's in a Name?*, 46 Am. Crim. L. Rev. 1563, 1580 (2009); Joan Comparet-Cassani, *Balancing the Anonymity of Threatened Witnesses Versus a Defendant's Right of Confrontation: The Waiver Doctrine After* Alvarado, 39 San Diego L. Rev. 1165, 1194-96 (2002). Witness intimidation is a serious problem of an alarming magnitude, and it plagues many of our communities. *See Alvarado*, 5 P.3d at 222 & n.14; Comparet-Cassani, *supra*, at 1194-204. As a result, the prosecution of members of violent gangs—such as this prosecution of Ramos-Cruz—will often trigger safety concerns for many of the witnesses involved.

---

[2]I refer to the witnesses using their pseudonyms throughout my opinion.

B.

Nevertheless, in addressing these concerns, we cannot undermine our constitutional commitment to ensuring that criminal defendants, even those accused of belonging to violent criminal organizations, receive a fair trial. That means they must be allowed to rigorously test the government's evidence, including all of its witnesses, in an adversarial proceeding before a jury. *See Craig*, 497 U.S. at 845; *See Strickland v. Washington*, 466 U.S. 668, 685 (1984). I am unconvinced that they are able to do so if the government can completely withhold the true names of its witnesses throughout the trial.

Access to the true names of the government's witnesses is critical to ensuring that a criminal defendant is able to rigorously test their testimony in an adversarial manner. As noted, effective cross-examination often entails challenging the witness's credibility. Hence, the opportunity for effective cross-examination, which the Sixth Amendment guarantees, includes the opportunity to challenge the witness's credibility. *See Van Arsdall*, 475 U.S. at 679-80. But without a government witness's true name, the criminal defendant is unable to perform the type of investigation—whether in court or out of court—necessary to be able to challenge his credibility. *See Smith*, 390 U.S. at 131. The criminal defendant cannot explore the witness's background and qualifications to discover any facts that might reflect poorly on his credibility. *See Alvarado*, 5 P.3d at 221. In effect, denying a criminal defendant knowledge of the true names of the government's witnesses severely inhibits his ability to perform what is often the most potent aspect of effective cross-examination: impeachment. In my opinion, because completely forbidding a criminal defendant from learning a witness's true name prevents the opportunity for effective cross-examination, it denies the defendant a fundamental aspect of a fair trial.

My concerns with completely denying criminal defendants access to the true names of the witnesses testifying against

them extend beyond practical consequences. Allowing the use of anonymous witnesses also undermines the perception that our criminal trials are open and even contests. Instead, it creates the impression that our criminal trials contain clandestine aspects that operate to provide the government with an upper hand. It does so by suggesting that convictions can be "based on the charges of . . . unknown—and hence unchallengeable—individuals," *Lee*, 476 U.S. at 540, even if they can be physically seen. Simply put, obtaining a conviction by using anonymous witnesses appears eerie and covert, and does not inspire confidence in the promise that our criminal trials are open and even endeavors.

Thus, even when safety concerns exist, district courts should require disclosure of the government's witnesses' true names to the defense, even if the disclosure is limited.[3] Along these lines, I embrace the approach approved by the D.C. Circuit in *Celis*. If, for safety reasons, the district court finds it necessary to allow a witness to testify using a pseudonym in open court, it should require the government to disclose the true name of the witness to defense counsel outside of court. The district court could, in its discretion, fashion a protective order limiting the extent of further disclosure and determining at what stage disclosure must occur. This would allow the district court to ascertain, on an individualized basis, whether defense counsel's proposed avenues of investigation are nec-

---

[3]I would not limit this disclosure requirement to crucial witnesses, as at least one court has, *see Alvarado*, 5 P.3d at 223. The Sixth Amendment guarantees criminal defendants the opportunity for effective cross-examination of all government witnesses, irrespective of their relative importance to the government's case. Because, in my opinion, this requires access to the witnesses' true names, I would not distinguish between crucial and noncrucial witnesses. Nor would I limit my disclosure requirement to instances in which it is clear that the witness's credibility will be at issue. A witness's credibility is always potentially at issue, depending on what, if anything, the defense learns about the witness. In fact, the defense needs the witness's true name to determine whether credibility will be an issue.

essary to ensure the opportunity for effective cross-examination and whether they would unduly expose the witness to danger. In my mind, this approach strikes an appropriate balance between a criminal defendant's right to a fair trial and the safety concerns accompanying some witnesses' testimony. It does not sacrifice one to the other.

Because the district court allowed Perez and Diaz to testify using pseudonyms and completely denied the defense access to their true names, I think it abused its discretion. Ramos-Cruz, without access to Diaz's and Perez's true names, was unable to conduct any meaningful inquiry into their backgrounds or qualifications. This strikes me as especially problematic with respect to Diaz, who the district court allowed to testify as an expert on MS-13 in El Salvador. By denying Ramos-Cruz any access to Diaz's and Perez's true names, the district court essentially denied him the opportunity to cross-examine them in any meaningful manner on facts suggesting bias, prejudice, ulterior motives, or untruthful disposition. As a result, I do not think the court provided Ramos-Cruz with the opportunity to conduct effective cross-examination.

C.

The government maintains that defense counsel had the opportunity to conduct effective cross-examination despite not knowing Diaz's and Perez's true names. In so arguing, it emphasizes the information it provided the defense. For instance, it notes it supplied defense counsel with the transcript of Diaz's and Perez's previous testimony. It further observes it informed defense counsel that the witnesses did not have any *Giglio* issues[4] and that the district court also questioned the witnesses about their background during an ex parte hearing, from which the defense was excluded, to ensure

---

[4]In *Giglio v. United States*, 405 U.S. 150 (1972), the Supreme Court determined that the government must disclose evidence adversely affecting the credibility of its witnesses. *Id.* at 153-54.

no such issues existed. The government insists that defense counsel's suggestion that it could have unearthed impeachment material if provided with the witnesses' true names is mere speculation. In light of all of this and the fact that defense counsel had the opportunity to cross-examine Diaz and Perez in person, the government contends the limitation on Ramos-Cruz's ability to discover their true names was an appropriate exercise of the district court's discretion.

I find this argument, particularly as it relates to the government's and district court's inquiries into the witnesses' backgrounds, unpersuasive. Our method of criminal adjudication relies upon the "common-law tradition . . . of live testimony in court subject to adversarial testing," not the civil law inquisitorial method of "examination in private by judicial officers." *Crawford v. Washington*, 541 U.S. 36, 43 (2004); *see also id.* at 50 (recognizing that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure"). We thus define a fair trial as one in which the evidence is subject to adversarial testing. *Strickland*, 466 U.S. at 685. But here, the district court and the government investigated Diaz's and Perez's backgrounds in private. They then announced to the defense that the witnesses had nothing to disclose and, by refusing to provide the witnesses' true names, effectively prevented defense counsel from verifying this information. In this respect, what took place below resembles more the inquisitorial method of examination than our adversarial method. Because we rely upon the adversarial method as the hallmark of a fair trial, I am unable to accept the government's and district court's investigations into the witnesses' backgrounds as adequate substitutes for defense counsel's ability to do the same.

Nor do I find persuasive the government's argument that "[a]ny suggestion that the defense would have unearthed impeachment material if [it] had learned the witnesses' identities is mere speculation." Because the defense does not have the true names of the witnesses, it is unable, and cannot be

expected, to know whether any specific impeachment material exists. All it can do is speculate. But the government seeks to justify not turning over the true names because defense counsel can only speculate that impeachment material exists. This circular reasoning is unappealing to me. Credibility is a potential issue for every witness, and often the only way to know whether a witness has credibility issues is to investigate the witness's background. We rely on the adversarial method to reveal credibility issues, which means criminal defendants must be given the tools essential to doing so.

Finally, I do not agree with the government that Ramos-Cruz had the opportunity to conduct effective cross-examination because it supplied him with the witnesses' prior testimony and he was able to confront them in person. This argument ignores the fact that the opportunity for effective cross-examination entails not only the ability to question witnesses on the substance of their testimony, but also to impeach their credibility by demonstrating bias, prejudice, ulterior motives, or an untruthful disposition. Access to a witness's true name is often the essential first step to determining the existence of such facts that would impugn the witness's credibility. I therefore cannot say that Ramos-Cruz had the opportunity to cross-examine Diaz and Perez effectively when he was essentially denied the opportunity to impeach their credibility.

## III.

My finding of error does not end the inquiry, however. Harmless-error analysis applies to unconstitutional limitations on a criminal defendant's right to cross-examination. *See Van Arsdall*, 475 U.S. at 684. "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* To find an error harmless beyond a reasonable doubt, we must "be able to say with fair assurance, after

pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Abu Ali*, 528 F.3d 210, 256 (4th Cir. 2008) (quoting *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997)) (internal quotation marks omitted). The Supreme Court has set forth a nonexhaustive list of five factors to guide this inquiry: 1) "the importance of the witness'[s] testimony in the prosecution's case"; 2) "whether the testimony was cumulative"; 3) "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points"; 4) "the extent of cross-examination otherwise permitted"; and 5) "the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684.

Although I think the district court erred in allowing Perez and Diaz to testify using pseudonyms without any disclosure of their true names to the defense, I nevertheless would find the error harmless beyond a reasonable doubt. Even operating under the assumption that if provided access to Perez's and Diaz's true names Ramos-Cruz would have discovered damaging information that would have allowed him to discredit their testimony completely, I can safely say with assurance that the error did not substantially sway the judgment of the jury.

Perez and Diaz primarily testified as to the organization of MS-13 and how MS-13 in El Salvador was linked to MS-13 in the United States to prove that the gang was a criminal enterprise for purposes of the racketeering charges. Other evidence amply proved it was a criminal enterprise and demonstrated the link between MS-13 in El Salvador and MS-13 in the United States. Diaz's and Perez's testimony was cumulative and not critical to establishing that MS-13 is a criminal enterprise. The strength of the government's case as to this element was strong. Thus, even if the jury had not given any weight to Diaz's and Perez's testimony, the other evidence established beyond a reasonable doubt that MS-13 is a crimi-

nal enterprise with ties that extend from the United States to
El Salvador.

## IV.

For these reasons, I decline to join Part II.C of the majori-
ty's opinion, but nevertheless join in affirming as to the issue.
Otherwise, I am pleased to concur in the remainder of the
majority's opinion.