**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 24-4576**

_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

DAQUA LAMEEK RITTER, a/k/a Quavo,

Defendant – Appellant.

_____

Appeal from the United States District Court for the District of South Carolina, at Aiken. Sherri A. Lydon, District Judge.  (1:23−cr−00024−SAL−1)

_____

Argued:  December 11, 2025                    Decided:  February 18, 2026

_____

Before KING, HARRIS, and RICHARDSON, Circuit Judges.

_____

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge King and Judge Harris joined.

_____

**ARGUED:**  Lindsey S. Vann, JUSTICE 360, Columbia, South Carolina, for Appellant. David N. Goldman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Harmeet K. Dhillon, Assistant Attorney General, Jesus A. Osete, Principal Deputy Assistant Attorney General, Andrew G. Braniff, Brant S. Levine, Appellate Section, Civil Rights, Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Bryan P. Stirling, United States Attorney, Charleston, South Carolina, Benjamin N. Garner, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

RICHARDSON, Circuit Judge:

Appellate courts review; they do not retry. We owe juries—and presiding trial judges—real deference on fact-bound calls and credibility determinations. That deference is dispositive here.

A jury convicted Daqua Ritter of three charges related to Ritter's murder of a transgender woman. On appeal, Ritter argues that a juror was biased, that a jury instruction was insufficient to cure the harm caused by an inadmissible hearsay statement, and that the evidence was insufficient to convict. Giving deference to the judge and jury, we reject Ritter's challenges and affirm.

## I.    BACKGROUND

Defendant Daqua Ritter grew up in rural Allendale, South Carolina.[1] Though he later moved away, he often returned there during summers. During his visits, he maintained a sexual relationship with victim Ernest "Dime" Doe—a "biological male" who "presented as a female," J.A. 263–64.

While Doe openly referred to Ritter as Doe's "man" or "boyfriend," Ritter tried to keep the relationship secret. J.A. 606. He often told Doe to delete their messages. And Ritter became angry whenever people brought up his relationship with Doe, stating on several occasions that he would beat Doe when others brought up their sexual relationship. Though Doe feared Ritter, their relationship continued.

---

[1] Because Ritter was convicted at trial, we present the facts in the light most favorable to the jury's guilty verdict. *See United States v. Perry*, 92 F.4th 500, 514 (4th Cir. 2024).

When Doe was found shot dead in a car beside a rural road, rumors implicating Ritter quickly surfaced. Just hours earlier, Doe had been pulled over for speeding while Ritter was in the passenger seat. That stop was the last time that Doe was seen alive. Hours later, Doe was dead. And Ritter then showed up at his uncle's house—blocks away from the crime scene—asking for a ride into town. Before long, Ritter asked friends to dispose of his gun and burned his clothes in a barrel. This initiated a years-long investigation conducted by state and federal law enforcement.

A federal grand jury eventually indicted Ritter for: (1) willfully causing bodily injury to Doe because of Doe's gender identity, resulting in death, under 18 U.S.C. § 249(a)(2); (2) using a gun during a crime of violence, under 18 U.S.C. § 924(j)(1); and (3) lying to investigators about Doe's murder, under 18 U.S.C. § 1512(b)(3). A jury convicted Ritter on all counts, and the district court sentenced him to life in prison.

## II.    DISCUSSION

Ritter challenges the jury's guilty verdict on three grounds: juror bias, inadmissible hearsay, and insufficient evidence. We reject those claims and affirm Ritter's convictions.

### A.    Alleged Juror Bias

Ritter first contends that Juror 71's alleged bias warranted a new trial. We review the district court's denial of a new trial deferentially, reversing only for abuse of discretion. *See United States v. Council*, 77 F.4th 240, 264 (4th Cir. 2023).

Ritter claims that Juror 71—a transgender woman—was biased against Ritter. The claim turns on what Juror 71 said and did after the verdict.

3

During jury selection, Juror 71 voluntarily disclosed to the court: "I am trans. And I just didn't want that to become an issue. I personally don't think it would affect my decision one way or the other, but I'll leave that up to you." J.A. 131; *see also id.* (answering "no" to the question: "would your identity as transgender prevent you from rendering a verdict in this case based solely on the evidence that you see in this courtroom and the law as I give it to you?"). Neither party asked any follow-up questions, and Juror 71 was eventually selected to serve as the jury's foreperson.

Shortly after returning the verdict, Juror 71 contacted the press about the trial. One newspaper quoted Juror 71 as saying, "In my personal experience, it can be dangerous for transgender women to date," and that transgender people "are everywhere. If one of us goes down, there'll be another one of us on the jury." J.A. 1306–07. Juror 71 told another newspaper, "I wish I had this great angle to give you as a reporter, that my gender identity weighed on this heavily and I saw myself in the victim, but honestly, it didn't. I followed the evidence and law and followed the judge's instructions and did what was asked of me and came to that conclusion." J.A. 1405.

After these articles went live, the district court held an evidentiary hearing. The court asked many questions of Juror 71, who affirmed that no past experience affected Juror 71's ability to fairly consider the evidence. The court found Juror 71 credible in the jury "questionnaire, during jury selection, at sidebar, and on numerous occasions at the post-trial hearing." J.A. 1474. The court found that Juror 71's statements to the press did not contradict the juror's oath of impartiality.

4

On appeal, Ritter argues that Juror 71's post-trial actions suffice to show actual bias.[2]  Actual bias exists only when a juror cannot or will not decide the case solely on the evidence.  *Porter*, 23 F.4th at 327.  The district court observed Juror 71's demeanor, posed probing questions, and found the juror both credible and impartial.  We reverse such credibility findings only for "manifest error."  *United States v. Turner*, 389 F.3d 111, 117 (4th Cir. 2004) (quoting *Patton v. Yount*, 467 U.S. 1025, 1031 (1984)).  None exists here.

## B.    Hearsay Testimony

Ritter next argues that the district court should have granted a mistrial because a curative instruction could not alleviate the prejudice caused by an inadmissible hearsay statement made at trial.

At trial, the government called Kerria Mallory as a witness.  When Doe was killed, Mallory was dating Ritter's uncle, Kalvin Peeples.  Mallory testified that she was at Peeples's home when Ritter showed up asking Peeples for a ride into town.  About half an hour later, Mallory drove past the murder scene, where she saw first responders surrounding Doe's car.  Mallory called Peeples to share what she saw.  During her direct examination, the government asked Mallory:  "And what was [Peeples's] reaction when you told him that information?" J.A. 911.  The defense objected to the question on hearsay grounds.  The government responded that it sought to elicit only Mallory's description of

---

[2] Ritter's claim of actual bias differs from a so-called *McDonough* claim.  *See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555 (1984).  Under *McDonough*, a litigant challenges a juror's failure to truthfully answer questions in jury selection.  *See Porter v. White*, 23 F.4th 322, 331 (4th Cir. 2022).  Ritter does not raise a *McDonough* claim.

Peeples's demeanor, so the district court allowed Mallory to answer. But Mallory responded that Peeples told her that he had "heard that [Ritter] killed Dime Doe." J.A. 912.

Agreeing that the testimony was inadmissible, the parties discussed at sidebar how best to clear things up. The government agreed to confront Mallory with her inconsistent grand jury testimony and to clarify that she didn't know from whom Peeples "heard" about the murder. And defense counsel subsequently cross-examined Mallory on this discrepancy, confronting Mallory with her grand jury testimony that directly contradicted her claim at trial. Initially, Mallory doubled down on her new claim. But on redirect, she eventually seemed to agree with the government that during the phone call, Peeples "never said" that Ritter killed Doe. J.A. 921.

After Mallory's testimony, defense counsel moved for a mistrial. The defense argued that Mallory's statement essentially amounted to a confession, because other evidence showed that Peeples had been with Ritter shortly before the call. The judge denied the motion for a mistrial, but provided a strong, specific curative instruction that the statement must be disregarded:

> Prior to lunch, the last witness on the stand was Ms. Mallory, and you heard her make a statement that was hearsay. Hearsay is an out-of-court statement, and our rules don't allow hearsay evidence; our very important Rules of Evidence.
>
> She provided an out-of-court statement made by Kalvin Peeples. I am advising you to disregard this statement. She was asked, what reaction did Mr. Peeples have when you told him you saw a crime scene near his house? And she gave an out-of-court statement, a hearsay statement that he said he heard that [Ritter] killed Dime Doe.

6

> I am instructing you to disregard that statement as evidence. You are to wipe it from your minds as if it was never said. It is not evidence. You cannot treat it as evidence. And you have taken an oath to follow my instructions, so I expect you not to treat it as evidence in any way.

J.A. 932; *see United States v. Martin*, 756 F.2d 323, 328 (4th Cir. 1985) (holding that before granting a mistrial, "the court should always consider whether the giving of a curative instruction or some alternative less drastic than a mistrial is appropriate.").

On appeal, Ritter argues that the curative instruction failed to cure the prejudice caused by Mallory's inadmissible testimony.[3] In his view, the district court judge was required to grant a mistrial based on the testimony's prejudicial effect. We find no abuse of discretion. *United States v. Hart*, 91 F.4th 732, 745 (4th Cir. 2024).

When a district court issues a curative instruction, courts presume that the jury follows it. *See Samia v. United States*, 599 U.S. 635, 646–47 (2023). This presumption is "almost invariable." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). It yields only in the "exceptional" case where inadmissible evidence makes so strong an impression that its prejudicial effect cannot realistically be erased by an instruction to disregard. *Hopt v. Utah*, 120 U.S. 430, 438 (1887). Evidence of this sort would need to be uniquely prejudicial— the type of vivid evidence that a jury couldn't be expected to disregard. For example, some confessions made by a non-testifying defendant that directly implicate a co-defendant will

---

[3] Ritter does not argue that the curative instruction's content was ambiguous or ill-worded. *See United States v. Ince*, 21 F.3d 576, 583–84 (4th Cir. 1994) (holding that a vague curative instruction failed to remedy erroneously admitting a highly prejudicial confession).

7

meet that standard. *See Samia*, 599 U.S. at 647–53; *see also Bruton v. United States*, 391 U.S. 123, 135–37 (1968).[4]

After the brief testimony was accidentally elicited, both parties impeached Mallory. Before Mallory left the stand, she seemed to acknowledge that she had made a mistake in her trial testimony—or, at the very least, that her trial testimony conflicted with her sworn grand jury testimony. So the hearsay testimony was already undermined before the district court issued its clear, direct, and comprehensive instruction.

Moreover, the testimony was far from the sort of vivid evidence that might be incurably prejudicial. Ritter argues that the hearsay testimony amounted to an incurable confession. But the testimony didn't amount to a confession at all. Mallory's testimony suggested only that Peeples had "heard" that Ritter killed Doe. Although Peeples had been with Ritter shortly before making this comment—and so the jury might view this testimony as an implicit confession—the jury also heard throughout trial that the local "rumor mill" had quickly implicated Ritter as the killer. J.A. 376. So the jury could just as plausibly have concluded that Peeples "heard" this information from somebody other than Ritter. We decline to characterize the testimony as a confession.

What remains is a vague report—without a source, without details, and later walked back—that Peeples heard that Ritter killed Doe. The district court acted well within its

---

[4] A non-testifying defendant's confession is admissible against him as a statement of a party opponent. Fed. R. Evid. 801(d)(2)(A). But it is not admissible in a joint trial as evidence against a co-defendant, at least on that basis. *Cf. United States v. Dargan*, 738 F.3d 643 (4th Cir. 2013). The *Bruton* line of cases recognizes that when a confession directly implicates a co-defendant, a limiting instruction directing the jury to consider it only against the confessor cannot cure the Confrontation Clause violation.

discretion in deciding that any prejudice from that testimony could be cured by a strong, specific instruction telling the jury to disregard it.

### C.     Sufficiency Of The Evidence

Finally, Ritter challenges the sufficiency of the evidence on two charges. Defendants raising a sufficiency challenge bear a "heavy burden." *United States v. Huskey*, 90 F.4th 651, 662 (4th Cir. 2024) (quotation omitted).  The Court views the evidence in the light "most favorable to the prosecution" and assumes "the jury resolved all credibility disputes or judgment calls in the government's favor." *Id.* (quotation omitted).  Although we review the district court *de novo*, we must uphold the jury's verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Millender*, 970 F.3d 523, 528 (4th Cir. 2020) (emphasis in original).

### 1.     "Because of . . . gender identity"

Ritter first challenges his conviction under 18 U.S.C. § 249(a)(2) for willfully causing bodily injury to Doe because of Doe's gender identity, resulting in death.  Ritter focuses on the motive element, arguing that the evidence was insufficient to prove that he killed Doe "because of" Doe's "actual or perceived . . . gender identity." § 249(a)(2)(A). But before addressing the evidence presented at trial, we try to clarify what the statute requires.

First, what does it mean for somebody to act "because of" a given trait?  This Court recently addressed this very question in *United States v. Hudak*, which interpreted identical language in 18 U.S.C. § 245(b)(2) and 42 U.S.C. § 3631(a).  *See* 156 F.4th 405, 410–11 (4th Cir. 2025).  Following a long line of Supreme Court cases, we held that "because of"

9

incorporates "the traditional but-for causation standard."[5] *Id.* at 410 (collecting cases). We apply that same standard here.

So the government had to show that Ritter would not have killed Doe but for Doe's "actual or perceived . . . gender identity." The statute defines "gender identity" as "actual or perceived gender-related characteristics."[6] § 249(c)(4). Inserting this definition into the operative provision yields the requirement that the government prove Ritter killed Doe because of Doe's "actual or perceived" "actual or perceived gender-related characteristics." That's not a typo—at least not on our part. But repeating the "actual or perceived" modifier makes for awkward repetition, if not statutory gibberish. What, for instance, are "perceived perceived" or "actual actual"—or "actual perceived"—gender-related characteristics? But because Ritter has not argued that this textual ambiguity creates any problems, we do not address those potential concerns.

Nor is it clear what the term "gender-related characteristics" encompasses.[7] But we need not define the outer limits of "gender identity" to resolve this appeal. Instead, we need only ensure that sufficient evidence supported the jury's finding that Ritter killed Doe

---

[5] This standard does not require the government to show that a given trait was a defendant's sole (or even primary) motive. *See, e.g.*, *Burrage v. United States*, 571 U.S. 204, 211 (2014).

[6] This definition does not require proof that the victim identified as transgender. *See* J.A. 1165 ("The United States need not prove what gender identity Dime Doe was or that Dime Doe was a transgender female.").

[7] The phrase is potentially quite capacious. It might even swallow the statute's earlier enumeration of "gender" as a protected characteristic. Because gender might itself be a "gender-related characteristic," an assault motivated by a victim's gender might fall within the statute's definition of an assault motivated by "gender identity."

10

because of *some* characteristic related to gender. And although the parties have not wrestled with the statutory definitions, the evidence—viewed in the light most favorable to the government—was sufficient to lead a rational juror to conclude that Ritter killed Doe because of one of Doe's perceived gender-related characteristics: Doe's biological sex.[8]

The evidence showed that the broader Allendale community knew that Doe was a biological male who presented as a woman. Ritter was very sensitive about people finding out that he was in a relationship with Doe, because Ritter didn't want people questioning his sexuality. So Ritter pressured Doe to keep their relationship secret, including by asking Doe to delete the messages they exchanged. Despite Ritter's secrecy, several people eventually found out about their relationship. As a result, one person called Ritter a "faggot," J.A. 631, while another thought that Ritter "must be" gay. J.A. 762. When others brought up their relationship, Ritter repeatedly became angry and said that he would "beat" Doe. J.A. 617, 761. Thus, Ritter treated his relationship with Doe very differently than his relationships with biological women, which he openly discussed.

The evidence here was sufficient for a rational juror to find that Ritter killed Doe because Doe was a biological male. The evidence suggests that Ritter was motivated in large part by Doe's desire to publicize their relationship. In other words, one but-for cause of Ritter's decision to murder Doe was Doe's indiscretion. But the evidence also supports a jury finding that Ritter would not have killed a biological female who was similarly public

---

[8] Regardless of how one might interpret the term "gender-related characteristics," biological sex neatly fits within the category. Whatever distinctions one might wish to draw between sex and gender, sex is related to gender.

11

about their relationship.   Whereas Ritter was open about his prior relationships with biological females, he was secretive about his relationship with Doe.  And Ritter expressed anger with Doe when Doe wasn't sufficiently discreet.  From this evidence, a reasonable juror could conclude that Ritter wouldn't have killed Doe "but for" the fact that Doe was a biological male.  Because biological sex is a "gender-related characteristic," there was sufficient evidence to find that Ritter killed Doe "because of" Doe's "gender identity." § 249(a), (c).

### 2.    Nexus to federal law enforcement

Ritter also argues that the evidence was insufficient to convict him under 18 U.S.C. § 1512(b)(3) for lying to investigators about Doe's murder.  This charge was based on several lies that Ritter told to South Carolina Law Enforcement Division agents when he was interviewed the day Doe was murdered.  Among other things, Ritter lied about:  (1) being with Doe earlier that day when Doe was pulled over for speeding and (2) getting a ride from Ritter's uncle less than a mile from where Doe was killed.

To prove witness tampering under § 1512(b)(3), the government had to establish three elements:  (1) Ritter knowingly engaged in misleading conduct toward another person; (2) Ritter acted with the intent to hinder, delay, or prevent communication of information to a federal law enforcement officer; and (3) the information related to the commission or possible commission of a federal offense.

While the first and third elements present no difficulty, the intent element warrants closer examination.  How can a defendant form the intent to "hinder, delay, or prevent"

12

communication to a federal law enforcement officer without contemplating any specific federal officer?

The Supreme Court addressed this question in *Fowler v. United States*, 563 U.S. 668 (2011), which interpreted § 1512(a)(1)(C)—a subsection of the same statute that prohibits killing somebody "with intent to . . . prevent the communication by any person to a law enforcement officer . . . of the United States" of "information relating to the . . . possible commission of a Federal offense." § 1512(a)(1)(C). The Court held that a defendant acts with the requisite intent to "prevent" such a communication whenever it is reasonably likely that the information would have been communicated to a federal officer but for the defendant's conduct.[9] *Fowler*, 563 U.S. at 678.

*Fowler*'s reasoning applies here. Section 1512(b)(3) prohibits knowingly "engag[ing] in misleading conduct[10] toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer . . . of the United States of information relating to the commission or possible commission of a Federal offense." Although the prohibited conduct differs between the two subsections—"misleading

---

[9] Taken in isolation, one could reasonably read § 1512(a)(1)(C) to require the defendant to kill the victim with the subjective intent to prevent a communication from reaching *federal* officers—*i.e.*, that the defendant must have in mind the officer's federal status. But § 1512(g)(2) states that "no state of mind need be proved with respect to" the officer's federal status. In *Fowler*, the Supreme Court resolved this apparent tension by requiring two things: (1) the defendant must at least have the (subjective) "intent to prevent communications to law enforcement officers in general" and (2) it must be (objectively) reasonably likely that "at least one relevant communication would have been made to a federal law enforcement officer." 563 U.S. at 674–78.

[10] "Misleading conduct" is statutorily defined to include "knowingly making a false statement." 18 U.S.C. § 1515(a)(3)(A).

conduct" instead of murder—the language relating to the defendant's intent is materially the same.[11] *Fowler*'s reasonable-likelihood standard therefore governs our interpretation of § 1512(b)(3).

*Fowler*'s reasonable-likelihood standard isn't onerous. It just requires that the likelihood of communication to a federal officer at the time of the misleading conduct be "more than remote, outlandish, or simply hypothetical." *Fowler*, 563 U.S. at 678. This likelihood "may be inferred by the jury from the fact that the offense was federal in nature, plus additional appropriate evidence." *United States v. Ramos-Cruz*, 667 F.3d 487, 497 (4th Cir. 2012) (quotation omitted). And collaboration between federal and state law enforcement can be a factor supporting a reasonable likelihood finding. *See United States v. Smith,* 723 F.3d 510, 518 (4th Cir. 2013).

We hold that a reasonable juror could have found that it was reasonably likely that information—here, Ritter's statements to state agents—would have been communicated to federal officers. Recall that we conduct this likelihood inquiry in the counterfactual world where Ritter did not engage in the deceitful conduct. In other words, we ask whether it is reasonably likely that state agents would have communicated Ritter's statements to federal

---

[11] Though it doesn't ultimately change our analysis, one difference between the statutory subsections is worth noting: Whereas the statute in *Fowler* only used the verb "prevent," the statute here uses the set of verbs, "hinder, delay, or prevent." § 1512(b)(3). *Fowler* relied in part on a specific dictionary definition of "prevent." 563 U.S. at 675–76. While "hinder" and "delay" don't share the same definition, they get at similar concepts. And *Fowler*'s core reasoning applies with equal force to these verbs. That is, it would be odd to speak of an intent to delay or hinder a future act that has no chance of occurring. *See id.* at 674–75. So we apply *Fowler*'s reasonable likelihood standard despite the presence of "hinder" and "delay" in § 1512(b)(3).

officers if Ritter had been honest with state agents about his whereabouts on the day of the murder.

For starters, the information that Ritter was trying to conceal was "information relating to the commission . . . of a Federal offense": Ritter violated § 249(a)(2), as his subsequent conviction demonstrates. And a reasonable juror could consider the fact that Ritter's underlying conduct constituted a federal offense in drawing the inference that an honest statement to state agents would have been communicated to federal officers. *Ramos-Cruz*, 667 F.3d at 497.[12]

What's more, "additional appropriate evidence" permitted a reasonable juror to find that the reasonable likelihood standard was met. *Id.* The jury heard evidence that South Carolina Law Enforcement Division agents "share information all the time" with federal officers.[13] J.A. 255. And although the investigation into Doe's murder began as a state investigation, state agents eventually *did* involve federal law enforcement. *See Ramos-Cruz*, 667 F.3d at 497 (considering actual federal involvement as probative of the likelihood of communication to federal officers). From that evidence, a juror could reasonably conclude that truthful statements from Ritter would likely have been shared.

---

[12] Though we assess the likelihood of communication at the time of the misleading conduct, later events are evidence from which that likelihood may be inferred. *See Ramos-Cruz*, 667 F.3d at 497–98.

[13] Given the limited law-enforcement resources in Allendale, the South Carolina Law Enforcement Division—the statewide law enforcement agency—handled the investigation from the earliest stages.

This evidence is not overwhelming.  But "overwhelming likelihood" is not the standard.  We ask only whether there was enough evidence to permit *a* reasonable juror to conclude that had Ritter been truthful with state agents, his statements would likely have reached federal officers.  Under this deferential standard, we affirm the jury's verdict.

*      *      *

The district court acted within its discretion in denying Ritter's motions for a new trial based on inadmissible hearsay or an allegedly biased juror.  And there was enough evidence to support the jury's guilty verdict.  Accordingly, the district court's judgment is

*AFFIRMED*.